UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

United States of America ex rel.     §
Michael Sorensen,                    §
                                     §
        Plaintiff,                   §
                                     §
versus                               §     Civil Action H-12-00480
                                     §
Outreach Diagnostic Clinic LLP, et al., §
                                     §
        Defendants.                  §
                                     §

## Opinion on Partial Summary Judgment

1.  *Introduction.*

    Outreach Diagnostic Clinic LLP supplies ophthalmological services. Medicare reimbursed Outreach for testing its patients for glaucoma. This action was filed against Outreach for intentionally mischaracterizing the records they sent to Medicare for payment and violating the False Claims Act. The government intervened and moved for summary judgment. The government will prevail.

2.  *Background.*

    Outreach Diagnostic Clinic is a Texas limited liability company. It offers ophthalmology and other eye-care services through its Outreach Eye Care branch. Mustapha Kibirige is an ophthalmologist. He owns and operates Outreach. Michael Sorensen is an optometrist who started at Outreach in July 2005. Emelike Agomo is an ophthalmologist who became Outreach's medical director in 2010.

    Outreach examines its patients for glaucoma. It is a disease in which extraneous fluid gathers within the eye causing pressure to build on the eye's optic nerve. Over time, the pressure causes blindness. The early stages of glaucoma can be detected by measuring eye pressure, a procedure known as tonometry.

    Tonometry uses instruments that measure the force necessary to cause detectable changes to the corneal surface; the instruments can vary in operation. For

example: (a) an air-puff tonometer measures the cornea's reaction to a puff of pressurized air; (b) an indentation tonometer measures the depression of the cornea as it is pressed; and (c) an applanation tonometer measures the flattening of the cornea. Outreach performed tonometry on its patients using Goldmann tonometers and Tono-Pens which are applanation tonometers.

Medicare reimburses physicians for the detection and treatment of glaucoma. Many of Outreach's glaucoma-suspect patients are Medicare recipients. Reimbursement claims are submitted by filing Medicare CMS 1500 or 837P forms that employ five-digit codes from the Current Procedure Terminology Codes. These correspond with descriptions of services. A service that is billed under one code cannot be separately billed under another. Otherwise, a physician would be compensated twice.

From February 2006 to December 2011, Outreach instructed its physicians and staff to bill the Tono-Pen eye pressure sessions under Code 92120. During that time, at least 14,450 of those claims were submitted. In 2010, Sorensen approached Agomo with concerns that Outreach should not bill the eye pressure checks under that code. Sorensen contended the code applied only to tonography, a procedure related to – yet distinct from – tonometry.

Sorensen sought the opinion of another optometrist. He advised Sorensen that Outreach should not bill eye pressure checks under the code because checking a patient's eye pressure with a Tono-Pen or Goldmann tonometer was tonometry – not tonography.

In June 2010, Sorensen shared that optometrist's opinion with Agomo and was assured that the issue would be resolved. In the interim, Sorensen instructed Outreach's technicians to stop billing under the code.

Two months later, Sorensen showed Agomo the opinions of the American Optometric Association, American Academy of Ophthalmology, and the Review of Ophthalmology. The experts agreed that Outreach was not performing tonography and should not bill under that code when checking a patient's eye pressure with a Tono-Pen or Goldmann tonometer. Agomo told Sorensen that the issue would be brought to Kibirige's attention and corrected.

In early 2011, Sorensen noticed that Outreach was still billing under the code. He continued to talk to Agomo about its usage. At a staff meeting, Agomo announced that Outreach could continue to bill under the code for eye pressure checks. He said

that the code was appropriate so long that they manually plotted a patient's eye pressure on a paper graph. Agomo reasoned that the history of a patient's eye pressure would be represented on the graph after successive visits and that this would bring Outreach into compliance.

Sorensen again consulted the American Optometric Association, American Academy of Ophthalmology, and the Review of Ophthalmology. The experts disagreed with Agomo's proposal. Sorensen refused to bill under the code after showing the experts' opinion to Agomo.

In November 2011, Agomo nonetheless continued billing under the code in accordance with the method he suggested. Still, Sorensen refused. He disagreed with Agomo and Kibirige's interpretation of the code. Specifically, Sorensen contended that neither Tono-Pens nor Goldmann tonometers could be used to perform tonography. In June 2012, Sorensen resigned.

3. *The Code.*

Code 92120 clearly identifies tonography and describes two covered methods of conducting tonography. Nothing is ambiguous in its language or how it should be applied.

CPT codes and Medicare reimbursements are regulated and administered as federal law. The court gives effect to the clause's purpose. Ambiguous provisions are interpreted according to their plain language and all terms are given meaning. A clause is ambiguous only if it can be reasonably interpreted in multiple ways, but mere interested disagreement between the parties is not ambiguity.[1]

Code 92120 says "Tonography with interpretation and report, recording indentation tonometer method or perlimbal suction method."

The government says that the code refers to one procedure that may be performed by either of two methods. It says the procedure is tonography with interpretation and report, and the two methods of performing the tonography are (a) recording indentation tonometer or (b) perlimbal suction.

Outreach says that the comma after the word "report" shows that the code refers to a series of services. It says the code applies to three separate procedures: (a)

---

[1] Reliant Energy Serv. Inc., v. Enron Canada Corp., 349 F.3d 816, 822 (5th Cir. 2003).

tonography with interpretation and report, (b) recording indentation tonometer method, or (c) perilimbal suction method. Outreach contends that, because the code includes the words "recording indentation tonometer method," it was appropriate to bill under the code when checking eye pressure with a Tono-Pen.

Outreach's interpretation fails for two reasons. First, other CPT codes use an Oxford comma or a semicolon when listing separate categories, while Outreach's construction of the code does not.[2] Second, Outreach's interpretation requires inconsistent phraseology by identifying tonography in its capacity as a procedure, yet tonometry according to its instruments. In short, Outreach's interpretation misses a plain reading of the code and creates ambiguity out of clarity.

4. *False Claims Act.*

The government has moved for a summary judgment on their claim that Outreach violated the False Claims Act[3] by billing for Medicare reimbursements under the code. When determining whether liability attaches under the FCA, the court considers (a) whether there was a false statement or fraudulent course of conduct; (b) made or carried out with the requisite scienter; (c) that was material; and (d) that caused the government to pay out money or to forfeit moneys due.[4]

A. *False Statement.*

The question is whether Outreach intentionally made false statements to the government to receive Medicare payments it had not earned.

Outreach says it did not violate the FCA because the code described indentation tonometry and a Tono-Pen is an indentation tonometer. Alternatively, Outreach says that it is not liable under the FCA because it performed tonography with the Tono-Pen.

Since the code clearly names and describes tonography, the question is whether the data supports Outreach's alternative position. It does not.

---

[2] *See* Exhibit B; CPT codes 92081, 92082, 99348, and 99349.

[3] 31 U.S.C. § 3729.

[4] U.S. ex. rel. Harman v. Trinity Industries Inc., 872 F.3d 645, 653-54 (5th Cir. 2017).

(1) *Tonography.*

The evidence shows that tonography is the measurement of the aqueous outflow facility of the eye under continuous pressure. In other words, tonography measures the rate fluid leaves the eye as the eye is pressed. By contrast, tonometry is the measurement of intraocular pressure. The government gives scientific evidence supporting the substantive differences between the two procedures and the technology used to perform them.

Specifically, the evidence shows that the "recording indentation tonometer method" of tonography uses an electronic Schiotz tonometer. The Schiotz indents the eye to record intraocular pressure and produces a graph showing the aqueous outflow facility as the eye is continually pressed for four to five minutes. As its name suggests, the graphing process is not manual but electronic, and is done in one sitting rather than over successive visits.

(2) *The Tono-Pen.*

Outreach says that the Tono-Pen is the modern equivalent of an electronic Schiotz tonometer. It says that the Tono-Pen does tonography internally and then presents a digital reading of intraocular pressure.

Outreach's argument fails for two reasons. First, the evidence shows that the Tono-Pen is an applanation tonometer – not an indentation tonometer. Second, the evidence also shows that the defining feature of tonography measures aqueous outflow facility – not intraocular pressure. Outreach has no scholarly or scientific evidence to controvert that definition. Instead, it contends that there is merely a difference of opinion between it and other practitioners whether the Tono-Pen performs tonography. That "disagreement" does not, it says, meet the level of falsity needed to support an FCA claim. Outreach cites cases holding that an FCA claim arising from a physician's exercise of judgment must be predicated on objectively verifiable facts that are at odds with that judgment.[5]

Those cases, however, are about differences in physicians' opinions in the exercise of *subjective clinical judgment* in patient prognosis. For example, whether a patient should be diagnosed with glaucoma is within a ophthalmologist's subjective

---

[5] U.S. v. Vista Hospice Care, Inc., WL 3449833 *17 (N.D.Tex. 2016).

clinical judgment. By contrast, it is objectively verifiable whether a Tono-Pen is an indentation tonometer that performs tonography by measuring the aqueous outflow facility of the eye. To that end, the government's expert witness, David A. Wallace, M.D., helped invent the Tono-Pen. Wallace says the Tono-Pen is an applanation tonometer – not an indentation tonometer. He says emphatically that the Tono-Pen is incapable of performing tonography. A compelling rebuttal of Outreach's position.

B.    *Scienter.*

Specific intent to defraud is unnecessary.[6] The government must demonstrate that Outreach had (a) actual knowledge of falsity, (b) acted with deliberate ignorance of the truth or falsity of the information provided, or (c) acted with reckless disregard of the truth or falsity of the information provided.

At minimum, Outreach's billing practices were reckless. Neither Kibirige nor Agomo made a genuine inquiry into whether the Tono-Pen performed tonography. They persisted in using the code despite Sorensen's repeated objections. They feigned compliance by manually plotting eye pressure measurements on a graph. They ignored opinions from the American Optometric Association, American Academy of Ophthalmology, and the Review of Ophthalmology. In sum, Outreach acted with reckless disregard for whether the code accurately represented the service they were using.

C.    *Materiality.*

Outreach's false claims were not simply material to receiving Medicare payments, they were critical. Under the FCA, a false or fraudulent statement is material if it has the potential to influence the government's decisions.[7]

Medicare's billing system treats tonometry and tonography differently. Tonometry is part of an intermediate or comprehensive service, while tonography is billed separately as a special service.[8] In other words, tonometry is not separately

---

[6] U.S. ex rel. Longhi v. U.S., 575 F.3d 458, 468 (5th Cir. 2009).

[7] Id. at 470.

[8] Exhibit B, Page 34.

reimbursable. By billing tonometry as tonography, Outreach caused the government to pay money.

### D. *Causation.*

Finally, causation is established if the knowingly, material, false statements caused the government to pay money. Outreach used third-party billing and accounting companies to submit its claims. The companies had no duty to check the veracity of the claims but merely ensured that the forms were completed before submitting them to Medicare. Upon receipt, Medicare disbursed payments to Outreach according to the completed bills. Neither party disputes that Outreach received $807,450 by billing for tonography 14,450 times. Obviously, the claims on those forms caused the government to pay Outreach for services it never rendered.

## 6. *Conclusion.*

Tonometry and tonography are related, yet distinct, procedures used to detect glaucoma. The former measures intraocular pressure, while the latter measures aqueous outflow facility. Accordingly, Medicare and the Current Procedure Terminology Code treat the reimbursement of these two acts differently.

CPT Code 92120 unambiguously describes tonography. Outreach Diagnostic Clinic LLP posits an interpretation, but it is inconsistent with the language of the rules and prevailing medical practice. The data show that Outreach did not conduct tonography. Rather, Outreach used a Tono-Pen to measure its patients' eye pressure. No genuine dispute exists that the Tono-Pen is not capable of performing tonography. Consequently, Outreach violated the False Claims Act by billing tonometry as tonography. The government's motion for summary judgment will be granted.

Signed on March 16, 2020, at Houston, Texas.

Lynn N. Hughes
United States District Judge